T.C. Memo. 1999-421


UNITED STATES TAX COURT


ESTATE OF FRANK M. DISANTO, DECEASED, ROXANNE DISANTO
TINNELL, BYRNADETTE DISANTO, AND FRANK DISANTO,
COEXECUTORS, Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

ESTATE OF GRACE J. DISANTO, DECEASED, ROXANNE DISANTO
TINNELL, BYRNADETTE M. DISANTO, AND FRANK R. DISANTO,
COEXECUTORS, Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket Nos. 10344-97, 21951-97.[1]  Filed December 27, 1999.


W. Curtis Elliott, Jr., Paul M. Hattenhauer, and William R.
Culp, Jr., for petitioners.

James E. Gray and Paul G. Topolka, for respondent.

_____

[1]  We consolidated these cases for trial, briefing, and
opinion over petitioners' objection.  Consolidating these cases
serves judicial economy and does not affect the result in either
case.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined deficiencies in estate tax of $4,362,142 for the Estate of Frank M. DiSanto (Mr. DiSanto), and $3,791,104 for the Estate of Grace J. DiSanto (Mrs. DiSanto).

Mr. DiSanto owned a controlling block of 186,177 shares (53.5 percent) of the stock in Morganton Dyeing & Finishing Corp. (MD&F) when he died on November 26, 1992.  Under his will, Mr. DiSanto left the residue of his estate to a trust for the benefit of Mrs. DiSanto and their children.  In May 1993, Mrs. DiSanto disclaimed part of her interest in Mr. DiSanto's estate which resulted in her being entitled to receive only a minority block of MD&F stock.  She died on June 4, 1993, before administration of Mr. DiSanto's estate was completed.

After concessions, the issues for decision are:

1.    Whether the fair market value of a block of 186,177 shares of MD&F stock on November 26, 1992, was $5,585,310 ($30 per share) as respondent contends; $2,263,912 ($12.16 per share) as petitioners contend; or some other amount.  We hold that it was $4,375,160 ($23.50 per share).

2.    Whether the fair market value of the MD&F stock Mrs. DiSanto was entitled to inherit from Mr. DiSanto's estate on June 4, 1993, was $1,705,522 ($14 per share) as respondent contends;

$270,311 ($2.22 per share) as petitioners contend; or some other amount. We hold that it was $1,583,699 ($13 per share).

3. Whether Mr. DiSanto's estate may compute the marital deduction based on the value of the stock (a controlling interest) he willed to Mrs. DiSanto, as petitioners contend, or based on the value of the shares she was entitled to receive after she executed the disclaimer (a minority interest), as respondent contends. We hold that it must compute the marital deduction based on the value of the shares Mrs. DiSanto was entitled to receive after she executed the disclaimer.

4. Whether checks written on Mrs. DiSanto's bank account that the bank had not paid before she died were completed gifts when she died. We hold that they were not and that those amounts are included in her estate.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect when the decedents died. Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. <u>Mr. and Mrs. DiSanto and Their Children</u>

Mr. and Mrs. DiSanto lived in Morganton, North Carolina. Mr. DiSanto died on November 26, 1992. Mrs. DiSanto had cancer and was in very poor health when Mr. DiSanto died. Mrs. DiSanto died at 4:30 a.m. on Friday, June 4, 1993, before administration

of Mr. DiSanto's estate had been completed. Mr. DiSanto's estate did not transfer any MD&F stock to Mrs. DiSanto before she died.

Roxanne DiSanto Tinnell, Byrnadette DiSanto, and Frank R. DiSanto are the children of Mr. and Mrs. DiSanto and coexecutors of their parents' estates. Roxanne DiSanto Tinnell and Byrnadette DiSanto lived in Los Angeles, California, when their parents died.[2] Alfred (Fred) DiSanto is Mr. DiSanto's younger brother.

B.  Morganton Dyeing & Finishing Corporation

1.  Formation and Operations

Mr. DiSanto and Fred DiSanto founded Morganton Dyeing & Finishing Corp. (MD&F) (formerly known as Bondsville Dyeing & Finishing Corp.), in 1954 in Bondsville, Massachusetts. In 1961, they moved MD&F to Morganton, North Carolina.

MD&F dyed and finished fabric for clothing. It performed services on commission. MD&F sent the finished fabric to a manufacturer which sewed it into garments.

2.  Ownership and Management

Rocco DiSanto, Fred DiSanto's son, left his dentistry practice and began to work for MD&F in the late 1980's. Rocco DiSanto has undergraduate degrees from Duke University in electrical engineering, mechanical engineering, and biomedical engineering.

---

[2]  The record does not indicate where Frank R. DiSanto lived when his parents died.

Fred DiSanto's and Mr. DiSanto's nephew, Jason Yates, worked for MD&F after he graduated from business school at the University of Tennessee.  He worked for MD&F's financial officer, H.L. (Bo) Browning.  By 1990, he had become a member of MD&F's management.

On November 26, 1992, the ownership of MD&F's stock was as follows:

| Shareholder | Number of shares outstanding | Percentage of total |
|---|---|---|
| Frank M. DiSanto | 186,177 | 53.50 |
| Alfred R. DiSanto | 86,752 | 24.93 |
| Gloria Yates | 13,605 | 3.91 |
| Byrnadette DiSanto | 12,102 | 3.48 |
| Roxanne DiSanto | 12,102 | 3.48 |
| Frank R. DiSanto | 12,102 | 3.48 |
| Robert E. Papuga | 8,700 | 2.50 |
| Rocco DiSanto | 5,484 | 1.58 |
| Donna Gooch | 5,484 | 1.58 |
| Andrea DiSanto | 5,484 | 1.58 |
| Total | 347,992 | 100 |

On November 26, 1992, the officers of MD&F were:  Mr. DiSanto, president and chief executive officer; Fred DiSanto, vice president; H.L. Browning, secretary-treasurer; Robert E. Papuga, vice president and plant manager; and Rocco DiSanto, assistant secretary-treasurer.

3.  Financial Condition

MD&F's net income and losses from 1988 to 1993 were as follows:

| Year | Year ending | Net income or (loss) |
|------|-------------|----------------------|
| 1988 | 3/26 | $106,054 |
| 1989 | 4/1 | 789,455 |
| 1990 | 3/31 | 1,042,548 |
| 1991 | 3/30 | 1,646,384[1] |
| 1992 | 12/26 | 1,185,216[2] |
| 1993 | 12/25 | (585,775) |

[1] In 1991, MD&F switched from a fiscal year ending Mar. 30 to Dec. 26.  MD&F's net income for the 9 months ending Dec. 31, 1991, was $1,362,684.

[2] Of MD&F's $1,185,216 net income for 1992, $790,012 was from a life insurance policy on Mr. DiSanto's life.

In 1991 and earlier years, MD&F had net profit margins of 8 to 10 percent.  After 1991, MD&F's net profit margins were less than 5 percent.  Some of MD&F's customers were in financial trouble in the late 1980's and in 1991 and 1992, in part because of foreign competition.

4. Water Usage

Water is one of MD&F's primary raw materials.  MD&F and the City of Morganton had disputes over water rates since the 1960's. In the early 1990's, the City of Morganton proposed doubling MD&F's water rates, which would have increased MD&F's water expenses by about $750,000 per year.  The proposed increase would have been almost twice MD&F's operating income for 1992.

5. Lawsuits

Before Mr. and Mrs. DiSanto died, MD&F had sued one of its customers, Leadertex, for nonpayment of $300,000.  Leadertex then sued MD&F for damages of more than $2 million for improperly processing fabric.  The parties settled the lawsuit, apparently

after Mr. and Mrs. DiSanto died.  In the settlement, MD&F agreed to pay an amount not stated in the record to press the fabric at issue and to waive the right to receive the $300,000 payment.

C.    Mr. DiSanto's Estate and Will

When he died, in addition to owning 186,177 shares of MD&F stock, Mr. DiSanto also had other probate assets worth $201,395.

In his will, Mr. DiSanto directed that the residue of his estate go to a trust for the benefit of his wife and children (Trust B).  In his will, he directed that the residue include only assets that qualify for the marital deduction or proceeds from the sale of those assets, and that any unified credit be used against the estate tax.  Mr. DiSanto's will gave discretion to his executor to sell or dispose of any property in his estate.

D.    Mrs. DiSanto's Disclaimer

On May 14, 1993, Mrs. DiSanto disclaimed her right to inherit from her husband $1,325,000 worth of his MD&F stock based on per share values "as finally determined on the Federal estate tax return".  She also disclaimed her right to withdraw the greater of 5 percent of the value or $5,000 from Trust B.  As a result of the disclaimer, the only asset in the residuary of Mr. DiSanto's estate that Mrs. DiSanto could inherit was a minority interest in MD&F stock.

E.    Checks That Did Not Clear Mrs. DiSanto's Bank Before She
       Died

The following checks were written on Mrs. DiSanto's Wachovia
Bank & Trust account before she died:

| Check no. | Date of check | Date paid | Amount | Payee |
|-----------|---------------|-----------|--------|-------|
| 792 | May 13, 1993 | June 4 | $2,500 | Jon McCallum |
| 796 | May 24, 1993 | June 4 | 1,500 | Cash |
| 851 | June 2, 1993 | June 4 | 10,000 | Mary Heitman |
| 852 | June 2, 1993 | June 4 | 10,000 | Lisa Melchioni |
| 853 | June 2, 1993 | June 4 | 10,000 | Lewis Dorman, III |
| 854 | June 2, 1993 | June 4 | 10,000 | Lewis Dorman, IV |
| 855 | June 2, 1993 | June 4 | 10,000 | Eleanor Dorman |
| 856 | June 2, 1993 | June 4 | 2,500 | Jean Sain |
| 860 | June 3, 1993 | June 11 | 2,500 | Cash |
| 861 | June 3, 1993 | June 11 | 5,000 | William Paul Austin |

Mrs. DiSanto signed check Nos. 792 and 796.  Roxanne DiSanto
Tinnell, who had Mrs. DiSanto's power of attorney, signed the
others.  A payee endorsed each check.  Wachovia Bank & Trust did
not pay any of these checks before Mrs. DiSanto died.

F.    The Estate Tax Returns

The Valuation Division of the Charlotte, North Carolina,
office of Deloitte & Touche prepared the estate tax returns in
issue.  Clifford Braly III (Braly), reviewed and signed the
estate tax returns as preparer.

Deloitte & Touche appraised the assets held by Mr. DiSanto's
estate.  Deloitte & Touche concluded that the fair market value
of Mr. DiSanto's 186,177 shares of MD&F stock was $4,803,728
($25.80 per share) as of November 26, 1992.

Deloitte & Touche also appraised the assets included in Mrs. DiSanto's estate. Deloitte & Touche concluded that, as a result of the disclaimer, Mrs. DiSanto's estate was entitled to receive 121,823 shares of MD&F stock from her husband with a fair market value of $1,891,911 ($15.53 per share) as of June 4, 1993.[3]

Petitioners timely filed estate tax returns for the estates of Mr. and Mrs. DiSanto and amended returns dated June 23, 1995. Mr. DiSanto's estate reported that his 186,177 shares of MD&F stock were worth $4,804,000 ($25.80 per share).

Mr. DiSanto's estate reported on Item 25, Schedule M (Bequests, etc., to Surviving Spouse) of the estate tax return that 121,823 shares of MD&F stock passed to Mrs. DiSanto. Mr. DiSanto's estate claimed a marital deduction of $3,143,055 (121,823 shares of MD&F worth $25.80 per share). Mrs. DiSanto's estate reported on Item 20 of Schedule B (Stocks and Bonds) of the estate tax return that her estate had 121,823 shares of MD&F stock.

G.  **MD&F's Redemption of Mr. DiSanto's Stock in 1995 and Bankruptcy in 1997**

The DiSanto children considered selling Mr. DiSanto's MD&F stock to outsiders after their parents died. In August 1994, Graham Reginald Pope (Pope), a certified public accountant,

---

[3] The record does not indicate how Deloitte & Touche calculated that number of shares.

helped the DiSanto children negotiate the redemption of Mr. DiSanto's MD&F stock. Fred DiSanto represented MD&F in the negotiations. The redemption price was $26.81 per share, more than any of the appraisals at that time. Other MD&F employees opposed paying that much to redeem Mr. DiSanto's stock. Fred DiSanto thought this price exceeded fair market value, but agreed to it to help his brother's family, his son, Rocco DiSanto, and his nephew, Jason Yates. MD&F also agreed to pay each of the children $315,000 to not compete with MD&F.

MD&F filed an insolvency petition with the U.S. Bankruptcy Court on November 4, 1997.

### OPINION

A. Fair Market Value of Mr. DiSanto's MD&F Stock on November 26, 1992

1. Contentions of the Parties

The parties dispute the value of Mr. DiSanto's 186,177 shares of MD&F stock (a 53.5-percent interest) when he died on November 26, 1992.

Petitioners contend that the fair market value of Mr. DiSanto's MD&F stock was $2,263,912 ($12.16 per share). This value is less than respondent's and petitioners' expert's estimates. Petitioners contend that petitioners' and respondent's expert failed to consider (1) that MD&F was not profitable after 1991, (2) the effect on MD&F of the death of Mr.

DiSanto and the lawsuit pending against MD&F, and (3) the potential for water rate increases.

Petitioners contend that the appraisals made by Deloitte & Touche for Mr. DiSanto's estate of $4,803,728 ($25.80 per share) and by MPI, its expert witness for trial, of $4,375,160 ($23.50 per share) were incorrect. Petitioners contend that Deloitte & Touche used earnings projections made by MD&F after Mr. DiSanto died and while Deloitte & Touche prepared the appraisal of Mr. DiSanto's estate, which petitioners contend were too optimistic.

Petitioners contend that we should not consider the redemption price of MD&F stock in 1995 in deciding the value of MD&F stock on November 26, 1992, or on June 4, 1993, because it was unforeseeable in 1992 and 1993, and because Fred DiSanto paid more than fair market value for the stock.

Petitioners point out that respondent's expert critiqued petitioners' experts' analyses but did not appraise the shares at issue.

Respondent contends that the fair market value of the 186,177 shares of MD&F stock owned by Mr. DiSanto was $5,585,310 ($30 per share) on November 26, 1992. Respondent bases this on the $26.81 redemption price and MD&F's payment of $315,000 to each of the DiSanto children not to compete. Respondent contends that MD&F's 1997 bankruptcy was unforeseeable on November 26, 1992. Respondent also contends that petitioners' experts used guideline companies that were dissimilar to MD&F, improperly

weighed MD&F's earnings, and placed too much emphasis on Mr. DiSanto's role in MD&F.

2.   Whether We Consider the 1995 Redemption of MD&F Stock

Respondent contends that the 1995 redemption is persuasive evidence of the fair market value of Mr. DiSanto's MD&F stock because it resulted from arm's-length negotiations.  We disagree.

We believe that Fred DiSanto caused MD&F to pay more than fair market value to redeem his brother's stock because he wanted to provide benefits to his brother's family and also to continue to provide employment for other family members.  Fred DiSanto credibly testified that he caused MD&F to overpay to redeem the stock in 1995.  Other MD&F employees disagreed with his decision to redeem the stock for $26.81 per share.  The redemption was emotional for the DiSanto family.  Emotional factors may preclude a redemption price from representing fair market value.  See, e.g., Krapf v. United States, 977 F.2d 1454, 1461 (Fed. Cir. 1992) (intrafamily sale of stock to company founder who would go to great lengths to secure survival of the distressed company was not reliable evidence of fair market value).

Respondent points out that negotiations occurred and that Pope represented the DiSanto children.  However, those facts do not negate the emotional factors that, we believe, led Fred DiSanto to agree to an excessive redemption price.  We give no weight to the 1995 redemption as evidence of fair market value of MD&F stock in 1992 and 1993.

Petitioners contend that, if we consider the redemption price in 1995, then we should also consider the fact that MD&F filed for bankruptcy protection in 1997. We need not do so because we do not consider the 1995 redemption price.

3. Expert Witnesses

Both parties retained experts to testify in these cases. Petitioners retained Management Planning, Inc. (MPI), to estimate the value of Mr. DiSanto's MD&F stock on November 26, 1992, as part of a control block and minority block, and Mrs. DiSanto's "expectancy interest" in Mr. DiSanto's estate (i.e., how much she would expect to receive from his estate) on June 4, 1993. Petitioners also retained William Harper Frazier (Frazier) to estimate the value of Mrs. DiSanto's estate's "expectancy interest" in Mr. DiSanto's estate on June 4, 1993.

Respondent retained Herbert T. Spiro (Spiro), president of American Valuation Group, Inc., as an expert witness. Spiro did not appraise the MD&F stock. Rather, he critiqued the reports prepared for petitioners by Deloitte & Touche and MPI and made adjustments to them based on those critiques.

The following chart shows the values of a share of MD&F stock as part of a control or minority block or an expectancy interest in a share of MD&F stock as reported in the tax returns, determined by respondent, contended by the parties, estimated by petitioners' experts, and adjusted by respondent's expert in critiquing petitioners' experts in these cases:

| | One Share in– | | | |
|---|---|---|---|---|
| Source | A control block on Nov. 26, 1992 | A minority block on Nov. 26, 1992 | A minority block on June 4, 1993 | An expectancy Interest on June 4, 1993 |
| Deloitte & Touche | $25.80 | | $15.53 | |
| P's Tax Returns | $25.80 | | $15.53 | |
| Notice of Deficiency | $52.50 | | $52.50 | |
| MPI | $23.50 | $14.96 | $13.00 | $9.00 |
| Frazier | | | $13.00 | [1]$3.67 |
| Spiro's critique of Deloitte & Touche | $27.72 | | $25.50 | |
| Spiro's critique of MPI | $26.28 – $30.35 | $15.03 – $17.36 | $13.32 – $14.76 | |
| P's posttrial brief | $12.16 | | $2.22 – if it were 121,823 shares | |
| R's posttrial brief | $30.00 | $16.00 | $14.00 | |

[1] Frazier estimated that the total value of Mrs. DiSanto's estate's interest in Mr. DiSanto's estate was $447,327. He did not estimate a per share value based on 121,823 shares as did the other experts. The $3.67 amount represents a per share value based on 121,823 shares with a total value of $447,323.

### 4. Evaluating the Experts' Opinions

We are not bound by the opinion of any expert, and we may accept or reject expert testimony in the exercise of sound judgment. See Phillips Petroleum Co. v. Commissioner, 104 T.C. 256, 302 (1995); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989).

MPI concluded that each share in Mr. DiSanto's estate had a fair market value of $23.50 when he died. Spiro testified that, generally, MPI's valuation method was reasonable.

Petitioners contend that none of their experts considered factors such as business trends, MD&F's financial position, MD&F's management, the death of Mr. DiSanto, a potential increase in water rates, and pending litigation. We disagree. MPI considered these items except for the proposed increases in water costs and pending litigation. Petitioners offered no evidence showing whether or to what extent the pending litigation or water costs affected the value of MD&F stock. Thus, we do not decrease MPI's estimate based on those factors.

Spiro criticized MPI for (a) not adequately justifying its conclusions, (b) relying solely on a market approach to value MD&F stock, (c) comparing MD&F to some companies that he believed were not similar to MD&F, and (d) applying incorrect weights to MD&F's earnings. We are not persuaded by Spiro's criticisms. He agreed that the market approach was an appropriate method here and did not apply any other method. He did not suggest any companies which he believed were more comparable to MD&F than those used by MPI. MPI gave equal weight to MD&F's earnings for a 5-year average, 5-year weighted average, and latest year. Spiro gave 45 percent of the weight to the 5-year average, 45 percent to the 5-year weighted average, and 10 percent to MD&F's most recent year's earnings, despite the fact that MD&F's

earnings were decreasing in 1992 and 1993.  Spiro's testimony did not convince us to revise MPI's estimates.

MPI's appraisal is reasonable and appears credible.  It is cogent and persuasive evidence that the $25.80 per share value reported on Mr. DiSanto's estate tax return is overstated.[4] Respondent offered no evidence of the value of MD&F stock other than the redemption price in 1995, which we do not consider.  See paragraph A-2, above.  We conclude that the fair market value of 186,177 shares of MD&F stock on November 26, 1992, was $4,375,160 ($23.50 per share).

B.    Value of Mrs. DiSanto's Interest in Mr. DiSanto's Estate When She Died

1.    Expectancy Interest

The parties disagree about the nature of Mrs. DiSanto's interest in her husband's estate.  Respondent contends that her estate had a right to receive 121,823 shares of MD&F stock. Petitioners contend that Mrs. DiSanto's estate had only an expectancy interest in Mr. DiSanto's estate, and that the value of her expectancy interest is less than the fair market value of the minority block of MD&F stock that she was entitled to inherit from Mr. DiSanto.  Petitioners contend that Mrs. DiSanto had only

---

[4]  MPI's appraisal is more favorable to petitioners than their position on the estate tax returns of Mr. and Mrs. DiSanto. Statements in a tax return are admissions unless overcome by cogent evidence that they are wrong.  Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).

an expectancy interest in Mr. DiSanto's estate because (a) no shares had been transferred while she was alive,(b) Mr. DiSanto's estate could have sold some of those shares to pay administration expenses, and (c) Mr. DiSanto gave her a residuary interest, not stock. We disagree. There is no evidence that Mr. DiSanto's estate needed to sell MD&F stock to pay administration expenses.

2. Value of MD&F Stock That Mrs. DiSanto Was Entitled To Receive Under Mr. DiSanto's Will After Her 1993 Disclaimer

We next decide whether to accept the values for MD&F stock that Mrs. DiSanto was entitled to receive (which are lower than those estimated for petitioners by Deloitte & Touche, MPI, and Frazier) as contended by petitioners, or higher values, as contended by respondent.

Petitioners contend that the Deloitte & Touche estimates are unreliable because Braly was inexperienced and made errors in Mrs. DiSanto's estate tax return. We disagree. Braly relied on Deloitte & Touche valuation experts to estimate the values of assets to use in Mrs. DiSanto's estate tax return.

Petitioners contend that Mrs. DiSanto's estate overestimated the value of her interest in Mr. DiSanto's estate. We disagree. There is no evidence that Deloitte & Touche made errors in appraising Mrs. DiSanto's estate. Deloitte & Touche's and MPI's estimates are similar.

MPI used the same general principles to appraise the value of Mrs. DiSanto's interest in her husband's estate that it used

to estimate the value of MD&F stock in her husband's estate when he died. MPI considered MD&F's declining net profits and the outlook for the fabric processing business between the times when Mr. and Mrs. DiSanto died. MPI estimated that each share in a minority block of 121,823 shares of MD&F stock had a fair market value of $14.96 on November 26, 1992, and $13 on June 4, 1993. The $1.96 difference per share multiplied by 121,823 shares equals $243,646. Respondent's concession that MD&F stock declined in value by about $250,000 between the deaths of Mr. and Mrs. DiSanto approximates MPI's estimate of the decline in value of a minority interest in MD&F stock during that time. We conclude that MPI's estimate of the decline in value of MD&F stock between the times Mr. and Mrs. DiSanto died is reasonable.

Petitioners speculate that the value of MD&F stock is lower than MPI's estimates. Petitioners point out that Mr. DiSanto's estate had not transferred MD&F stock certificates to Mrs. DiSanto's estate, and contend that it is possible that Mrs. DiSanto's estate would never possess MD&F stock. Petitioners also speculate a buyer of MD&F stock from Mrs. DiSanto's estate might become liable for Mr. or Mrs. DiSanto's estate taxes. We disagree. There is no credible evidence that these factors may affect the value of MD&F stock, or otherwise supporting petitioners' criticism of their expert's appraisals.

Frazier estimated that Mrs. DiSanto's interest in Mr. DiSanto's estate was worth $447,327 (76,012 shares of MD&F x

$5.88 per share).  Frazier used (a) a combination of the net asset value and market approaches, (b) a combination of the income and market approaches, and (c) the Black-Scholes method, and then applied various discounts.

We reject Frazier's estimate because he used the following assumptions which are not supported by the record:  (a) Administrative expenses, estate taxes, and liabilities would consume all of the liquid assets in Mr. DiSanto's estate and some of his MD&F stock; and (b) 45,811 shares of MD&F stock would have to be sold at $13 per share to satisfy Mr. DiSanto's estate's liabilities.

3.    Conclusion

We accept MPI's estimate that the fair market value of Mrs. DiSanto's interest in Mr. DiSanto's estate, that is, his MD&F stock, was $13 per share on June 4, 1993.

C.    Marital Deduction for the Estate of Mr. DiSanto

In computing the amount of the taxable estate, an estate may deduct the value of interests which pass from a decedent to the decedent's spouse (marital deduction).  See sec. 2056(a). Petitioners contend that the marital deduction for Mr. DiSanto's estate should be computed based on the value of the controlling block of 186,177 shares of MD&F stock held by Mr. DiSanto, not the value of the minority block to which Mrs. DiSanto was entitled after she executed the disclaimer.

In Rev. Rul. 81-20, 1981-1 C.B. 471, respondent ruled that an estate may deduct under section 2055 a decedent's bequest of the residue of his estate to a charity under certain conditions. Petitioners contend that, under Rev. Rul. 81-20, 1991-1 C.B. 471, we must compute the marital deduction for Mr. DiSanto's estate as a residuary interest because Mr. DiSanto gave Mrs. DiSanto a residuary interest in his estate, not stock. We disagree that Rev. Rul. 82-20, 1991-1 C.B. 471, applies because it does not involve a marital deduction.

Petitioners contend that we must base the marital deduction on the value of Mr. DiSanto's controlling interest in MD&F stock. We disagree. An estate may deduct "an amount equal to the value of * * * property which passes or has passed from the decedent to his surviving spouse". Sec. 2056(a). The value of the marital deduction for a devised interest in stock of a closely held corporation equals the value of the interest that passes to the surviving spouse. See sec. 2056(b)(4); sec. 20.2056(b)-4(a), Estate Tax Regs.; Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1588-1589 (1987). Thus, the marital deduction for Mr. DiSanto's estate is based on the value of the interest that passed from Mr. DiSanto's estate to Mrs. DiSanto.

Mrs. DiSanto's disclaimer reduced the value of her interest in Mr. DiSanto's estate, and reduced the amount of the marital deduction for Mr. DiSanto's estate. See sec. 2518(a). We have decided that the fair market value of each share of MD&F stock

that Mrs. DiSanto was entitled to receive from Mr. DiSanto's estate after she made the disclaimer was $13 per share when she died.  See paragraph B-3, above.  Mr. DiSanto's estate may claim a marital deduction based on that per share stock value.

Petitioners contend that we should disregard Mrs. DiSanto's disclaimer in deciding the amount of the marital deduction for Mr. DiSanto's estate just as we disregard postdeath fluctuations in the values of assets in estates in deciding marital deduction amounts.  We disagree.  Petitioners cite Rev. Rul. 90-3, 1990-1 C.B. 174.  In Rev. Rul. 90-3, 1990-1 C.B. 174, respondent ruled that the value of a residuary bequest to a surviving spouse does not change even if the value of estate assets fluctuates after the decedent dies.  Mrs. DiSanto's disclaimer of $1,325,000 worth of Mr. DiSanto's MD&F stock is not a postdeath fluctuation in the value of his stock.  Thus, Rev. Rul. 90-3, 1990-1 C.B. 174, does not apply here.

Petitioners contend that, if a surviving spouse executes a disclaimer, the marital deduction is merely reduced by the disclaimed amount, citing Estate of Nix v. Commissioner, T.C. Memo. 1996-109.  We disagree.  In Estate of Nix, we held that the disclaimer reduced the surviving spouse's interest in the decedent's estate by the value of disclaimed property.  Unlike the facts in Estate of Nix, here the qualified disclaimer reduces Mrs. DiSanto's interest in Mr. DiSanto's stock in MD&F from a controlling interest to a minority interest.

Petitioners cite Estate of Jameson v. Commissioner, T.C. Memo. 1999-43, for the proposition that respondent may not use one value for including the MD&F stock in Mr. DiSanto's estate and a lower value for calculating the marital deduction. We disagree. The decedent in Estate of Jameson bequeathed an amount to his children and the residuary to his wife. We held that his estate may not use a lower per share value of closely held stock to increase the number of shares to compute the bequest to his children and a higher per share value of the same stock to compute the marital deduction. Estate of Jameson v. Commissioner, supra, is distinguishable because the decedent's wife did not disclaim part of her interest as Mrs. DiSanto did here.

D. Whether Checks Not Yet Paid by the Bank When Mrs. DiSanto Died Are Completed Gifts Not Included in Her Estate

Petitioners contend that funds from Mrs. DiSanto's bank account paid by the bank for checks written by her or her daughter (with a power of attorney from Mrs. DiSanto) to make noncharitable gifts before Mrs. DiSanto died, are not includable in her gross estate. The bank paid those checks later on the day she died. Petitioners point out that Mrs. DiSanto died on June 4 at 4:30 a.m., before the bank opened and, thus, she could not instruct the bank to stop payment on June 4. Thus, petitioners contend, the gifts were completed when she died. We disagree.

A gift by check is completed when the donor no longer has dominion and control over the funds described in the checks and no power to change the disposition of the funds. See Estate of Newman v. Commissioner, 111 T.C. 81, 85 (1998), affd. per curiam by unpublished opinion (D.C. Cir. Sept. 15, 1999); Estate of Metzger v. Commissioner, 100 T.C. 204, 208 (1993), affd. 38 F.3d 118 (4th Cir. 1994); see also Burnet v. Guggenheim, 288 U.S. 280, 286 (1933). State law controls when a gift is completed. See Estate of Newman v. Commissioner, supra; Estate of Dillingham v. Commissioner, 88 T.C. 1569, 1575 (1987), affd. 903 F.2d 760 (10th Cir. 1990).

In North Carolina, a check not paid by the bank before the donor dies is not a completed gift and is a part of decedent's probate estate, see Huskins v. Huskins, 517 S.E.2d 146, 150 (N.C. Ct. App. 1999); Creekmore v. Creekmore, 485 S.E.2d 68, 72 (N.C. Ct. App. 1997), because, under North Carolina law, the donor can stop payment on a check until the bank pays the check or the donor dies, see sec. 25-4-403, N.C. Gen. Stat. (1995). The checks which the bank did not pay before Mrs. DiSanto died are not completed gifts because the bank did not pay the checks before she died. See Huskins v. Huskins, supra; Creekmore v. Creekmore, supra.

Petitioners contend that we should follow Bacchus v. United States, 57 AFTR2d 86-1519, 86-1 USTC par. 13,669 (D.N.J. 1985). In Bacchus v. United States, supra, the U.S. District Court for

the District of New Jersey held that, for purposes of the annual gift tax exclusion, gifts became complete upon payment of checks by the bank and related back to the time of their delivery to the donee. In that case the court relied on Estate of Belcher v. Commissioner, 83 T.C. 227, 235 (1984), and Estate of Spiegel v. Commissioner, 12 T.C. 524, 529 (1949), in which we held that the relation-back doctrine applies to charitable gifts. As a result, a charitable gift paid by check relates back to the time (i.e., is deemed to be made when) the donor delivered the check to the donee. In Estate of Newman v. Commissioner, supra at 87, we distinguished those cases on grounds that those cases involved gifts to charitable donees and annual gift tax exclusions rather than whether the funds are includable in the donor's gross estate. Charitable gifts differ from noncharitable gifts in that charitable gifts are deductible for income tax purposes. We have not extended the relation-back doctrine for estate tax purposes to noncharitable gifts made by check which were unpaid when the donor died. See id. This result avoids the possibility that payments deducted for income tax purposes by the donor would be includable in the donor's gross estate. See Estate of Newman v. Commissioner, supra at 88; Estate of Gagliardi v. Commissioner, 89 T.C. 1207, 1212 (1987).

In Estate of Metzger v. Commissioner, supra at 214-215, we held that, for purposes of section 2503(b), gifts of checks that were written, delivered, and deposited in the donee's bank

accounts before January 1, 1986, and were paid on January 2, 1986, related back to the delivery and deposit of those checks in December 1985.  Petitioners contend that, for estate tax purposes, we should extend the relation-back doctrine of Estate of Metzger v. Commissioner, supra, to checks that are unconditionally delivered and that the drawer bank promptly paid even though payment occurred after the donor's death.  We disagree for reasons stated in Estate of Newman v. Commissioner, supra at 89-90.

We conclude that the $64,000 of checks that did not clear the bank before Mrs. DiSanto died are included in her estate.

To reflect concessions of the parties and the foregoing,

Decisions will be entered

under Rule 155.